UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                                  Chapter 11

Shefa, LLC,                                                         Case No. 14-42812

         Debtor.                                                 Hon. Phillip J. Shefferly

_____ /

### OPINION (1) SUSTAINING IN PART
### DEBTOR'S OBJECTION TO PROOF OF CLAIM;
### (2) DENYING CONFIRMATION OF DEBTOR'S
### PLAN OF REORGANIZATION; AND (3) GRANTING
### MOTION FOR RELIEF FROM THE AUTOMATIC STAY

### INTRODUCTION

This is a single asset real estate Chapter 11 bankruptcy case involving a vacant hotel. The Oakland County Treasurer ("Oakland County") is the largest creditor in the case. Oakland County filed a proof of claim for real property taxes, and water and sewerage charges for the hotel. The debtor objected to the proof of claim and filed a combined plan of reorganization and disclosure statement. Oakland County objected to confirmation of the plan and moved for relief from the automatic stay. For the reasons set forth in this opinion, the Court will sustain in part the debtor's objection to Oakland County's proof of claim, deny confirmation of the debtor's plan of reorganization, and grant Oakland County's motion for relief from the automatic stay.

### JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (G), and (L).

## PROCEDURAL HISTORY

On February 25, 2014, Shefa, LLC ("Debtor") filed this Chapter 11 bankruptcy case. The petition states that this is a "single asset real estate case," as defined in § 101(51B) of the Bankruptcy Code. The single asset is a vacant hotel located at 16400 J.L. Hudson Drive, Southfield, Michigan ("Hotel").

The Debtor and its largest creditor, Oakland County, are parties to three contested matters: an objection to claim, a motion for relief from the automatic stay, and confirmation of a plan of reorganization. On February 26, 2014, Oakland County filed proof of claim no. 1 ("Oakland County Claim") as a secured claim in the amount of $3,665,155.82. On June 4, 2014, the Debtor filed an objection (ECF No. 33) to the Oakland County Claim. On May 20, 2014, Oakland County filed a motion for relief from the automatic stay (ECF No. 24) ("Motion for Stay Relief"). On May 26, 2014, the Debtor filed a combined plan of reorganization and disclosure statement (ECF No. 25) ("Plan").

On June 20, 2014, the Court held a hearing on the objection to the Oakland County Claim and on the Motion for Stay Relief. The Court noted that there were common issues of law and fact regarding both of these contested matters that may also overlap with issues of law and fact regarding confirmation of the Plan. After conferring with the parties, the Court determined that judicial economy would best be served by adjourning the hearing on the objection to the Oakland County Claim and the Motion for Stay Relief until the confirmation hearing on the Plan. On July 16, 2014, Oakland County filed an objection (ECF No. 44) to confirmation of the Plan.

On September 5, 2014, the Court held a hearing on all three contested matters. The Court found that there were disputed issues of fact and that all three matters required further briefing. The Court then set a schedule for discovery, briefing and an evidentiary hearing.

On December 10 and 11, 2014, the Court held the evidentiary hearing. The Debtor called five witnesses: Laurence Allen, an appraiser; Salomon Knafo, an investor; Eric Aouizerats, a consultant; Sidney Elhadad, the sole member of the Debtor; and Ieshula Ishakis, an attorney. The Debtor introduced into evidence exhibits A through U. Oakland County called one witness: Andrew E. Meisner, the treasurer for Oakland County. Oakland County introduced into evidence exhibits 1 through 20. At the conclusion of the evidentiary hearing, the Court took all three matters under advisement. This opinion constitutes the Court's findings of fact and conclusions of law with respect to all three matters.

FACTS

Based upon the evidence adduced at the evidentiary hearing, the Court finds the following facts.

The Hotel is a 14 story, 427 room hotel built in 1974 on nine acres located in the City of Southfield, Oakland County, Michigan. For many years the Hotel was known and operated as the Plaza Hotel. Although successful for a time, by the mid-2000's the Hotel was in serious financial distress, with high vacancy rates and poor collections. In 2007, Grand Pacific Finance Corp. ("Grand Pacific"), the holder of a first mortgage on the Hotel with an outstanding balance over $10.3 million, began a foreclosure proceeding and obtained the appointment of a receiver over the Hotel. At that time, there were also substantial delinquent taxes, and water and sewerage charges

-3-

owing by the Hotel to the City of Southfield. In 2008, Otzer Capital, LLC ("Otzer") the owner of the Hotel at that time, filed a Chapter 11 bankruptcy case, which was dismissed later that year.

Although the precise date is not clear from the record, at some point Otzer contacted Elhadad, an attorney from Montreal, Canada, to discuss the possibility of Elhadad purchasing Grand Pacific's mortgage note at a discount and then conducting a "friendly foreclosure" of the Hotel. Elhadad did not conduct much due diligence. But he did learn that the Hotel was not well managed, it was losing money, and there were substantial delinquent taxes, and water and sewerage charges owing by the Hotel. Nonetheless, Elhadad still thought this presented a good business opportunity. To do the deal, Elhadad formed the Debtor as a single member, limited liability company and agreed to have it purchase Grand Pacific's mortgage note and then foreclose on it to obtain title to the Hotel.

In May, 2009, the Debtor purchased Grand Pacific's mortgage note for $165,000.00. Elhadad gambled that after the Debtor bought the mortgage note at a discount, he could negotiate a deal with the City of Southfield to make a discounted lump sum payment for all of the taxes, and water and sewerage charges owing on the Hotel.

After purchasing Grand Pacific's mortgage note, the Debtor completed the foreclosure sale. On November 10, 2009, a sheriff's deed (exhibit P) for the Hotel was executed and delivered to the Debtor. Once the foreclosure sale was complete, the receiver was terminated. Elhadad then took over operation of the Hotel through a second limited liability company that he had formed.

Unfortunately, the Hotel continued to experience high vacancy rates and poor collections. The operating losses were much greater than Elhadad had anticipated. To fund the operating losses, Elhadad put in substantial funds of his own, approximately $1.5 million altogether, but it was not

-4-

enough. Further, it became clear that the City of Southfield placed a much higher value on the Hotel for taxation purposes than Elhadad did. Ultimately, Elhadad was unsuccessful in obtaining an agreement from the City of Southfield to accept a discounted lump sum payment for all of the outstanding taxes, and water and sewerage charges on the Hotel. The Hotel closed in October, 2010, and was subsequently boarded up.

To challenge what Elhadad believed to be the excessive valuation of the Hotel by the City of Southfield, Elhadad hired Ishakis to file a proceeding on behalf of the Debtor in the State of Michigan Tax Tribunal. Eventually, the Debtor and the City of Southfield reached a settlement of that proceeding. On June 5, 2012, two stipulations (exhibit T) were filed with the Michigan Tax Tribunal. The first stipulation provided for an agreed upon value of $2.2 million for the Hotel for 2009. The second stipulation provided for an agreed upon value of $1.6 million for 2010 as well as an agreed upon value of $1.5 million for the Hotel for 2011. A consent judgment (exhibit T) was entered by the Michigan Tax Tribunal approving these stipulations on June 25, 2012.

Notwithstanding the resolution of the Michigan Tax Tribunal proceedings, the Debtor did not reopen the Hotel and did not reach any agreement with the City of Southfield regarding the payment of the delinquent taxes, and water and sewerage charges. The Debtor tried to find financing for the Hotel, but was unsuccessful. Because Michigan law provides for cities to turn over unpaid taxes, and water and sewerage charges to the local counties for collection after one year of delinquency, Oakland County now held the City of Southfield's claim against the Hotel. Pursuant to its statutory duty under Michigan law, Oakland County moved forward to foreclose on the Hotel. Having no more funds to put into the Hotel, no deal to pay off the outstanding taxes, and water and

sewerage charges, and no prospect for outside funding, the Debtor filed this Chapter 11 case on February 25, 2014.

The Debtor's schedules list few creditors. Schedule D (part of exhibit A) lists four secured claims. Oakland County is listed in an unknown amount. Elbaz Building is listed in the amount of $269,800.00, although at trial Elhadad testified that he does not believe that this is a secured claim. Professionally Driven, LLC is listed in the amount of $3,500.00. Fernand Soultan is listed in the amount of $3 million, but at trial Elhadad testified that the Debtor does not actually owe a debt to Soultan. According to Elhadad, the Debtor granted a mortgage (exhibit 12) on the Hotel to Soultan on May 3, 2011 to secure a debt owed by Elhadad individually to Soultan. Although Elhadad readily admitted that the Debtor does not owe a $3 million debt to Soultan, to date the Debtor has not taken any action to avoid this mortgage. Schedule F (part of exhibit A) lists two unsecured creditors, Ishakis, for $189,541.00, and King Solomon Properties, LLC, for $282,000.00. Ishakis testified that his claim is for services rendered as an attorney and accountant. The record is unclear as to what gave rise to the debt owed to King Solomon Properties, LLC.

The Debtor has no employees and transacts no business. Its statement of financial affairs (part of exhibit A) shows that it received a total of $500.00 in 2011 for rents and did not receive any income for the last two years. Its monthly debtor in possession operating reports show that it had minimal income and expenses during this Chapter 11 case. They also show that the Debtor has not paid any post-petition taxes or water and sewerage charges.

The taxes for the Hotel have not been paid since 2005 (exhibit 15). The last payment made on the water and sewerage charges for the Hotel occurred in July, 2009 (exhibits E and S). The Oakland County Claim (exhibit 1) includes taxes, and water and sewerage charges for the

-6-

years 2006 through 2012. However, as explained by Meisner in his testimony, the Oakland County Claim includes only the total owing as of February 14, 2014. Because of the continuing accrual of interest, the total owing on the petition date of February 25, 2014, and now reflected in the Oakland County records (exhibit 2), had increased to $3,786,979.69. Of that total amount, the sum of $1,916,781.57 is owed for taxes, and the sum of $1,870,198.12 is owed for water and sewerage charges. According to Meisner, the reason why the outstanding taxes, and water and sewerage charges have not been collected going back to 2006 is due first to Otzer's Chapter 11 case, next to the Debtor's Michigan Tax Tribunal proceedings, and third because of this Chapter 11 case. All of these proceedings effectively stayed Oakland County's collection actions.

Meisner's testimony about the amounts owing, the processes prescribed by Michigan law for Oakland County to collect such amounts, and the delays in Oakland County's collection actions, is credible and uncontroverted. The Court finds that as of the petition date, the Debtor owed Oakland County a total of $3,786,979.69 consisting of $1,916,781.57 for taxes and $1,870,198.12 for water and sewerage charges.

The value of the Hotel on the petition date was much less than the Oakland County Claim. Allen is a certified commercial real estate appraiser and a member of the Appraisal Institute. He has extensive experience appraising commercial properties and, in particular, hotel properties. Allen has appraised the Hotel multiple times over many years. In 2012, Allen prepared an appraisal (exhibit J) that valued the Hotel at three different points in time: $1,570,000.00 as of December 31, 2008; $1,260,000.00 as of December 31, 2009; and $1,200,000.00 as of December 31, 2010. Allen prepared another appraisal (exhibit K) ("Appraisal") on April 30, 2014 that valued the Hotel at $690,000.00 as of April 21, 2014, two months after the petition date.

-7-

The Hotel is in poor condition. It has deteriorated greatly over the last several years, especially since it closed. The Appraisal indicates that there is extensive damage to the Hotel's plumbing and electrical systems caused by building scrappers and scavengers, and that there has been extensive theft of copper wire and pipes from the Hotel. The Appraisal also notes that there are significant water leaks in the roof, and there are many broken skylights and window walls on the first floor to contribute to those leaks. Even before the Hotel was shut down in 2010, there were already several items of deferred maintenance, all of which have only gotten worse since that time. Overall, the Hotel has a solid building structure, but it is in very poor shape internally and needs extensive repair.

According to Allen, the Hotel is in a declining area, particularly for hotels. Allen has appraised other hotels in this area and notes that they too are suffering financial distress. Allen concludes that the highest and best use of the Hotel is not as either a hotel or an extended stay facility. Instead, Allen believes that the highest and best use of the Hotel would be for senior housing and medical facilities, to take advantage of the proximity of Providence Hospital. But even if the Hotel were to be redeveloped for these purposes, Allen believes that such uses of the Hotel are not financially feasible absent substantial subsidies.

The Court finds Allen's testimony credible, well supported, and uncontroverted. The Court fully credits both the Appraisal and Allen's testimony regarding the value of the Hotel, the continuing deterioration of the Hotel's condition, and the highest and best use of the Hotel. Based upon Allen's testimony and the Appraisal, the Court finds that the Hotel is worth $690,000.00.

Despite the poor condition of the Hotel, and the fact that it has been vacant without any operating business since 2010, the Plan (exhibit B) proposes for the Hotel to be renovated and

reopened with approximately 150 rooms serving as an upper midscale, limited service hotel affiliated with a national brand; approximately 270 rooms converted to 140 larger rooms renovated for use as an upper midscale extended stay hotel affiliated with a national brand; and the balance of the rooms used for independent living. The Plan also proposes a restaurant, lounge, fitness center and meeting space on the first floor of the Hotel. The Plan states that the financing for all of this will be provided by SMi ENERPRO, consisting of approximately $2 million of financing for engineering and mechanical renovations, together with an SBA guaranteed loan. In addition, the Plan proposes that Elhadad will also provide funding either individually or through one of his entities.

The Plan specifies three classes of claims and one class of equity interests. Class one consists of the Oakland County Claim. Based upon the Debtor's objection to the Oakland County Claim, the Plan states that the allowed amount of the Oakland County Claim is limited to $690,000.00. The Plan provides for a lump sum payment in that amount to Oakland County on the effective date of the Plan, which is defined in the Plan as being eleven days after the order confirming the plan becomes a final order. The Plan states that class one is not impaired because Oakland County will be paid the full amount of the Oakland County Claim, to the extent that it is not disallowed based upon the Debtor's objection to it. Notwithstanding the description of class one as unimpaired, the Plan states that a ballot was provided to Oakland County "as a courtesy." Oakland County voted to reject the Plan.

Class two of the Plan consists of a secured claim in the amount of $3,500.00 held by Professionally Driven. The Plan provides for payment in full of this claim by 35 monthly

installments with no interest. The Plan states that class two is impaired. Professionally Driven voted to accept the Plan.

Class three of the Plan consists of general unsecured claims, which the Plan describes as aggregating $3,741,341.00. The Plan states that there are four creditors in this class: Ishakis and King Solomon Properties, both of whom are listed on the Debtor's schedules as unsecured creditors, plus Elbaz Building and Soultan, both of whom are listed on the Debtor's schedules as secured creditors. The Plan provides for payment of 2% to class three claims, without interest, in 120 monthly installments beginning on the effective date of the Plan. The Plan states that class three is impaired. Elbaz Building, Soultan and Ishakis all voted to accept the Plan. The Debtor did not receive a ballot from King Solomon Properties.

The Plan does not contain either a class four or class five, but does specify that class six consists of the equity interest in the Debtor. The Plan provides that class six will not be impaired if all impaired classes of claims (i.e., classes two and three) vote to accept the Plan. However, the Plan further provides that if an impaired class of claims votes to reject the Plan, then the treatment of class six will change, class six will be impaired, and the Debtor will conduct a "new value auction" of the class six equity interest. Elhadad, the sole equity holder in the Debtor, voted to accept the Plan.

By the time of the evidentiary hearing, the Debtor's intentions regarding the Plan had changed in two important respects. First, the Debtor now proposes payment of 30% rather than 2% to class three unsecured claims. That increases the total payments to class three creditors from $74,826.82 (i.e., 2% of $3,741,341.00) to $1,122,402.30 (i.e., 30% of $3,741,341.00). Because the Plan proposes to pay class three by means of 120 monthly installments, this increased percentage

also means that the Debtor's monthly payment to class three creditors will increase from $623.56 to $9,353.35. Second, the Debtor now proposes that the financing to renovate the Hotel and make Plan payments will be provided by a different source, KFG Southfield, LLC ("KFG"), also known as Knafo Financial Group. KFG is a limited liability company newly formed by Knafo, a long-time acquaintance of Elhadad, who is involved in investing, purchasing and selling distressed real properties.

Elhadad first contacted Knafo about the Hotel in the summer of 2014 after the Debtor had already filed the Plan. After speaking to Elhadad, Knafo became interested in the Hotel based upon his experience in the renovation of other distressed properties, including multi-family and mixed use properties in Atlanta and New York. Knafo visited the Hotel and began to conduct due diligence, speaking with brokers and other individuals, and consulting different sources of information regarding the location of the Hotel and the general economic climate in the area. In addition, Knafo reviewed materials (exhibits L, M, and N) provided to him by Elhadad regarding various possibilities for renovating the Hotel and converting it to a mixed use property, with separate portions to be used as a hotel, extended stay and independent living facilities. Knafo was sufficiently interested in the Hotel that he formed a new entity, KFG, along with two other individuals, Daniel Assouline and Michael Dodoun, to serve as the vehicle to do a deal regarding the Hotel. Like Knafo, both Assouline and Dodoun appear to have some access to funds for investment purposes (exhibits G and O).

In November, 2014, after the Debtor's creditors had voted on the Plan, KFG entered into two agreements with the Debtor. First, on November 10, 2014, KFG and the Debtor signed a loan

agreement (exhibit R) ("Loan Agreement"). Second, on November 19, 2014, KFG and the Debtor signed a letter of intent (exhibit Q) ("Letter of Intent").

The Loan Agreement provides for KFG to loan up to $50,000.00 to the Debtor to be used for repairs to the Hotel. The Loan Agreement states in section 1.2 that there is an attached "itemized budget" detailing the use of proceeds for the repairs to the Hotel. However, there is no "itemized budget" attached to the Loan Agreement, and Knafo testified that he has not even seen an "itemized budget" detailing the use of the loan proceeds for the repairs. Knafo testified that the Loan Agreement is conditioned upon approval by the Court. He acknowledged that as of the date of the evidentiary hearing, the Debtor had not filed a motion with the Court requesting approval of the Loan Agreement. Nonetheless, Knafo explained that if the Plan is confirmed, KFG will move forward with the Debtor to have the Loan Agreement approved so that the $50,000.00 can be disbursed by the Debtor to begin repairs to the Hotel.

The Letter of Intent states in section 1.1 that its purpose "is to confirm the interest of an investor group . . . to acquire the Hotel . . . with a view to redevelop and operate the Hotel as a mixed-use hotel and independent living property." The Letter of Intent states in section 1.2 that it is not a "binding obligation" for the "consummation of the Definitive Agreement," elaborating further that the terms and conditions set forth in the Letter of Intent are not binding except to the extent that they are expressly described in the Letter of Intent as "Binding Provisions." Section 2 reiterates that the Letter of Intent is "not intended to be and shall not be interpreted as being binding," and that it has "no legal effect and shall serve only to outline the overall parameters of the proposed agreement." Section 2.2 of the Letter of Intent provides that KFG and the Debtor will enter into "good faith negotiations with the view to agree, on or before January 31, 2015," on a

"definitive agreement."  Section 2.2 of the Letter of Intent further states that "[n]either party shall incur any obligation to enter into such a Definitive Agreement unless each party is entirety satisfied with the results of such negotiations at its sole discretion[.]"

Section 3 of the Letter of Intent is titled "Binding Provisions," and contains nine separate provisions.  None of those "Binding Provisions" obligate KFG to put in any money or make any loan to or investment in the Debtor.  The "Binding Provisions" are basically non-substantive boilerplate provisions regarding confidentiality, reimbursement of expenses, governing law and similar matters. Despite the fact that the Plan provides for funding from sources other than KFG, one of the "Binding Provisions" states that the discussions between the Debtor and KFG "are exclusive in nature and therefore the parties shall not carry on discussions with other parties in connection to matters related to the Hotel while this LOI remains in force."

Attached to the Letter of Intent is a "Term Sheet" that provides an outline of a proposed transaction between the Debtor and KFG.  The Term Sheet refers to the $50,000.00 to be loaned by KFG to the Debtor pursuant to the Loan Agreement once it is approved by the Court.  The Term Sheet provides that the loan will then be converted into an equity interest in a newly formed limited partnership that will be owned 60% by KFG and 40% by an entity designated by Elhadad, with KFG to be the general partner.  The Term Sheet further provides that KFG will contribute a total of $2 million of equity in consideration for its 60% partnership interest, and Elhadad will contribute the Hotel in exchange for his 40% partnership interest, explaining that up to $1 million of the equity contribution will be used to pay the creditors of the Debtor, including Oakland County, in the Chapter 11 bankruptcy case.  The balance of the equity contribution, according to the Term Sheet, will be used to renovate and rehabilitate the Hotel.  The Term Sheet, although noting the

non-binding nature of the Letter of Intent, specifies a closing date of January 31, 2015, or such later time as the Debtor and KFG may agree.

During his testimony, Knafo explained in more detail KFG's business plan for the Hotel. Basically, KFG and the Debtor plan to renovate and redevelop the Hotel as a mixed use facility, part hotel rooms, part extended stay facilities, and part independent living facilities. KFG and the Debtor intend to use the first floor of the Hotel for conference rooms, a spa, and a fitness room. KFG and the Debtor intend to have the Hotel affiliated with a national brand. Knafo also described how this business plan will be implemented. According to Knafo, it will take approximately 6 to 9 months to complete plans and inspections, another 6 to 9 months for the renovation, and up to another 18 months after opening before the Hotel is profitable. Altogether, Knafo projected that it will take approximately $12 million for the complete renovation of the Hotel on the terms envisioned by Knafo and Elhadad. The proposed $2 million equity contribution described in the Term Sheet attached to the Letter of Intent will, according to Knafo, provide funds for the Debtor to pay all of its creditors under the Plan, and provide for needed repair and deferred maintenance in the Hotel. The other $10 million needed for the renovation of the Hotel will be obtained by KFG from various lenders that Knafo has done business with.

Knafo's and Elhadad's vision for the mixed use renovation and redevelopment of the Hotel is supported by Aouizerats. Aouizerats is a consultant in the hotel industry with many years of experience on mixed use projects. He was hired by Elhadad individually to provide advice to him about the Hotel. Aouizerats testified that the proposed renovation and redevelopment of the Hotel envisioned by Knafo and Elhadad makes sense for the Hotel, and that a mixed use facility can be successful at the Hotel.

-14-

Elhadad, Knafo and Aouizerats all share the belief that the Hotel can be successfully renovated and redeveloped as a mixed use facility. However, they also all agree that it will take substantial funds to complete this renovation and redevelopment. They concede that neither KFG, nor any other investor or lender, is presently obligated to put any money into this project, either as a loan or as equity, although they seem confident that KFG and the Debtor will soon close a deal once KFG completes its due diligence. But even if a deal is closed, they all acknowledge that it will be at least 18 months before the Hotel is open for business and another 18 months before the Hotel generates income. None of them have prepared projections of future operations for the Hotel once it has been renovated and redeveloped. Although one of the memoranda (exhibit L) that Knafo had looked at regarding the renovation and redevelopment of the Hotel did contain a set of projections, Knafo testified that he did not agree with or rely upon those projections.

While it appears from Knafo's testimony that KFG may have access to funds that could be used to invest in a transaction with the Debtor regarding the Hotel, the evidence is clear and uncontroverted that the Letter of Intent and the Loan Agreement are non-binding, and that KFG is not presently committed to provide any funds to the Debtor under either of those documents. Knafo emphasized during his testimony that KFG is not presently committed either to make the loan described in the Loan Agreement or to provide the equity described in the Letter of Intent.

If KFG does not make the loan and the equity contribution described in the Loan Agreement and the Letter of Intent, the record establishes that the Debtor does not presently have any other source of funds to implement the Plan. When asked during his testimony where the necessary funds will come from in the event that KFG does not commit to provide such funds, Elhadad testified that he would "find a way" to provide the funds. He alluded to the possibility of obtaining funds from

family members.  But Elhadad acknowledged that he does not have a commitment from anyone to provide the funds necessary to make the payments under the Plan.  When asked about his own bank statements (exhibit H), he admitted that he has expended all of his funds, and presently has no funds of his own with which to fund the Plan.

To summarize, the Court finds that: (i) the amount owed on the Oakland County Claim on the petition date is $3,786,979.69, made up of $1,916,781.57 for taxes and $1,870,198.12 for water and sewerage charges; (ii) the value of the Hotel both on the petition date and as of now is $690,000.00; (iii) the Hotel has been closed since October, 2010; (iv) the Hotel's condition is deteriorating; (v) the Debtor has no employees or income and transacts no business; (vi) the Debtor has not paid any taxes or water and sewerage charges during this bankruptcy case; (vii) the Debtor has entered into a non-binding Loan Agreement and Letter of Intent with KFG, under which KFG is presently not obligated either to loan or invest any money in the Debtor or the Hotel; and (viii) the Debtor does not presently have a commitment from any other person or entity either to loan or invest any money in the Debtor or the Hotel.

## POSITIONS OF THE PARTIES

The Debtor makes three basic arguments.  First, the Debtor argues that the entire amount of the Oakland County Claim should be treated as taxes, and therefore must be disallowed under § 502(b)(3) of the Bankruptcy Code to the extent that it exceeds $690,000.00, the value of the bankruptcy estate's interest in the Hotel.  Because the Plan proposes to pay the entire allowed amount of the Oakland County Claim – $690,000.00 – in a lump sum on the effective date of the Plan, the Oakland County Claim is unimpaired under § 1124 of the Bankruptcy Code.  Therefore, Oakland County can neither object to nor vote on the Plan.

-16-

Second, the Debtor argues that all impaired classes of claims and interests have accepted the Plan, the Plan is feasible, and all of the requirements for confirmation under § 1129 of the Bankruptcy Code are met.

Third, the Debtor argues that because it has a confirmable plan of reorganization, the Motion for Stay Relief must be denied.

In response, Oakland County also makes three basic arguments. First, § 502(b)(3) does not apply to the Oakland County Claim for a multitude of reasons. According to Oakland County, nearly half of the Oakland County Claim is for water and sewerage charges, not taxes, and § 502(b)(3) applies only to taxes. Further, to the extent that the Oakland County Claim does include taxes, application of § 502(b)(3) to those taxes is barred by the Tax Injunction Act, 28 U.S.C. § 1341 and by § 505(a)(2) of the Bankruptcy Code, which limit the Court's jurisdiction to determine the amount or legality of any tax owing by the Debtor to Oakland County. Next, even if § 502(b)(3) might otherwise be applicable, the Court should refuse to apply it here because the Debtor is proposing to retain ownership of the Hotel, rather than have the bankruptcy estate abandon it. Finally, the effect of applying § 502(b)(3) to the Oakland County Claim is limited in this case because of § 1111(b) of the Bankruptcy Code.

Second, Oakland County argues that even if § 502(b)(3) does apply, the Oakland County Claim is impaired under the Plan and Oakland County is entitled to vote on and object to the Plan. Specifically, Oakland County argues that it is entitled to an allowed unsecured claim for whatever amount is disallowed by § 502(b)(3), either as a priority claim under § 507(a)(8) of the Bankruptcy Code or, minimally, as a non-priority unsecured class three claim. If the disallowed amount is given priority under § 507(a)8), then confirmation must be denied because § 1129(a)(9) requires payment

-17-

in full of priority claims.  If the disallowed amount is treated as a class three non-priority claim, then class three would no longer be an accepting class under § 1129(a)(8) because Oakland County would then become the holder of the largest class three claim, and it has voted to reject the Plan.  Because the Oakland County Claim is impaired, and Oakland County has not accepted the Plan, the Debtor can only confirm the Plan if it meets the cramdown requirements of § 1129(b), which it cannot do without violating § 1129(b)(2)(A) and (B).  Further, even if the Debtor prevails on every one of its § 502(b)(3) arguments, Oakland County asserts that confirmation must still be denied because the Debtor has failed to meet its burden to show that the Plan is not likely to be followed either by liquidation or by the need for further financial reorganization, as required by § 1129(a)(11).  In other words, the Debtor has failed to show that the Plan is feasible.

Finally, Oakland County argues that there is cause to lift the automatic stay under § 362(d)(1) and (2) of the Bankruptcy Code because the Plan is not confirmable, the Debtor filed this case in bad faith, the Debtor has no equity in the Hotel, Oakland County's interest in the Hotel is not adequately protected, and the Hotel is not necessary for a reorganization.

### DEBTOR'S OBJECTION TO THE OAKLAND COUNTY CLAIM

#### How § 502(b)(3) applies to the Oakland County Claim

Section 501 of the Bankruptcy Code governs the filing of proofs of claims.  Section 502(a) provides that a proof of claim filed under § 501 is deemed allowed unless a party in interest objects. Section 502(b) provides that if an objection to a claim is made, the Court, after notice and a hearing, shall determine the amount of the claim and shall allow the claim in such amount except to the extent that one of the grounds for disallowance set forth in § 502(b)(1) through (9) applies.

-18-

In its objection to the Oakland County Claim, the Debtor relies upon § 502(b)(3) which provides that a claim shall not be allowed to the extent that "if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property." Section 502(b)(3) was added as

> Congress's response to a situation that often saw estates almost entirely depleted by taxes to the detriment of unsecured creditors – in spite of the fact that the property was often thereafter abandoned to mortgagees or the taxing authorities. This was so because the taxes were construed, under many state statutes, to be taxes legally due and owing by the bankrupt personally although such tax debt might result in liens on the real estate. . . .
> . . .
> . . . Absent the application of § 502(b)(3), the taxing unit can collect from the debtor along with the unsecured creditors. To the extent the tax is paid to the taxing unit in that fashion, there will be a reduction or elimination of the tax lien on the property to the benefit of the successor owner. The application of [§ 502(b)(3)] precludes that windfall to the successor owner.

In re NVF Co., 394 B.R. 33, 40 (Bankr. D. Del. 2008) (internal quotation marks and citation omitted).

Section 502(b)(3) has three elements: first, it only applies to a claim for a "tax." Second, the tax must be "assessed against property of the estate." Third, it only applies where the claim "exceeds the value of the interest of the estate in such property."

Regarding the first element, the term "tax" is not defined in the Bankruptcy Code. However, the United States Supreme Court has discussed the meaning of "tax" both under the Bankruptcy Code and its predecessor, the Bankruptcy Act of 1898. In United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213 (1996) the Supreme Court addressed whether an exaction under 26 U.S.C. § 4971(a) was entitled to priority as an excise tax under § 507(a)(7)(E) of the Bankruptcy Code. In that case, the Supreme Court looked to its prior decisions that defined a tax as "a pecuniary burden laid upon individuals or property for the purpose of supporting the

-19-

Government." 518 U.S. at 224 (citations omitted). In another case, the Supreme Court addressed whether a New York sales tax was entitled to priority under § 64 of the Bankruptcy Act in City of New York v. Feiring, 313 U.S. 283 (1941). In New York v. Feiring, the Supreme Court defined taxes as "those pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purposes of defraying expenses of government or of undertakings authorized by it." 313 U.S. at 285; see also Yoder v. Ohio Bureau of Workers' Compensation (In re Suburban Motor Freight, Inc.), 998 F.2d 338, 339 n.2 (6th Cir. 1993) (recognizing the continuing validity of Feiring's definition of taxes).

The Oakland County Claim states on its face that it is for "taxes." However, the uncontroverted evidence shows, and the Court has already found, that despite this statement, not all of the Oakland County Claim is made up of taxes. Instead, it has two components: $1,916,781.57 for taxes, and $1,870,198.12 for water and sewerage charges. There is no dispute that the portion of the Oakland County Claim that is for taxes satisfies the first element of § 502(b)(3). But the parties do dispute whether the portion of the Oakland County Claim that is for water and sewerage charges satisfies this first element.

The Debtor does not argue that the water charges do not reflect water used by the Hotel or that the sewerage charges do not reflect sewerage services provided to the Hotel. Instead, the Debtor argues that these charges were transformed into a tax by operation of state law in Michigan. According to the Debtor, the process provided by Michigan law for the *collection* of delinquent water and sewerage charges has the legal effect of modifying the nature of these charges and converting them from fees to taxes. In support of this argument, the Debtor relies on Mich. Comp. Laws Ann. § 141.121(3), which states in relevant part:

Charges for services furnished to a premises may be a lien on the premises and those charges delinquent for 6 months or more may be certified annually to the proper tax assessing officer or agency who shall enter the lien on the next tax roll against the premises to which the services shall have been rendered, and the charges shall be collected and the lien shall be enforced in the same manner as provided for the collection of taxes assessed upon the roll and the enforcement of the lien for the taxes.

The Debtor's reliance upon this statute is misplaced. The express language of § 141.121(3) merely grants authority to a tax assessing officer or agency – in this case the Oakland County Treasurer – to act as a *collecting* agent for delinquent water and sewerage fees "in the same manner as provided for the collection of taxes." The statute does not state, either explicitly or implicitly, that the nature of the underlying obligation to pay the water and sewerage charges is in any way affected. The statutory grant of a lien to secure the payment of this obligation, and the statutory authority given to the Oakland County Treasurer to collect this obligation in the same manner that it collects taxes, does not somehow *ipso facto* make the water and sewerage charges taxes.

The only reported case cited by the Debtor in support of its contention that the water and sewerage charges for the Hotel constitute a tax is In re Van Beckum, no. 07-28650-svk, 2009 WL 122754 (Bankr. E.D. Wis. Jan. 15, 2009). However, the court in Van Beckum was construing Wisconsin law, not Michigan law, regarding the imposition of water and sewerage charges. Id. at *2, n.1 (noting that the "claim for water and sewer charges is considered a tax because these charges are given the status of a property tax under Wisconsin law") (citing Wis. Stat. §§ 66.0809(3) and 74.01). The Debtor did not cite to any authority holding that water and sewerage charges in Michigan constitute a tax.

The portion of the Oakland County Claim that consists of water and sewerage charges is not a tax. As a result, the Court holds that the water and sewerage charges of $1,870,198.12 do not

constitute a tax assessed against the Hotel as that phrase is used in § 502(b)(3). Therefore, the first element of § 502(b)(3) is not satisfied as to that portion of the Oakland County Claim, and the Debtor's objection to that portion of the Oakland County Claim must be denied. In contrast, and as explained above, the portion of the Oakland County Claim consisting of taxes in the amount of $1,916,781.57, does satisfy the first element of § 502(b)(3). However, by itself, that fact does not require disallowance under § 502(b)(3). The Court must still consider the remaining elements of § 502(b)(3).

As to the second element, there is no dispute that the portion of the Oakland County Claim consisting of taxes was "assessed against property of the estate," the Hotel. In order for the Court to disallow any of this amount, the Court must also consider the final element of § 502(b)(3): does the amount of $1,916,781.57 exceed the value of the bankruptcy estate's interest in the Hotel and, if so, by how much?

The record establishes that the Debtor owned the Hotel in fee simple when it filed Chapter 11. Under § 541(a)(1) of the Bankruptcy Code, the Debtor's fee simple ownership of the Hotel became property of the bankruptcy estate when the Debtor filed its petition, and it remains property of the bankruptcy estate today. Because the Appraisal establishes the value of the Debtor's fee simple interest in the Hotel at the time of the petition at $690,000.00, the value of the bankruptcy estate's interest in the Hotel as of the petition date was, at most, $690,000.00.

Obviously, the amount of the Oakland County Claim that indisputably consists of taxes – $1,916,781.57 – exceeds $690,000.00. As a result, the third element of § 502(b)(3) is met, but the Court still needs to determine to what extent. If the value of the bankruptcy estate's interest in the Hotel is $690,000.00, then a straightforward application of § 502(b)(3) mandates disallowance of

-22-

$1,226,781.57 of the Oakland County Claim (i.e., $1,916,781.57 less $690,000.00). However, if the Debtor's interest in the Hotel is encumbered by any liens or other interests that are superior to the lien that secures the Oakland County Claim, then the value of the bankruptcy estate's interest in the Hotel may be even less than $690,000.00. If so, then the amount of the Oakland County Claim required to be disallowed by § 502(b)(3) may be even greater.

The Debtor's schedule D lists four secured creditors, including Oakland County, that hold claims secured by the Hotel. The evidence at trial, especially Elhadad's testimony, raises serious doubts about whether two of these creditors (Elbaz Building and Soultan) truly do hold secured claims against the Hotel. But that fact turns out to be irrelevant to this inquiry. The Debtor does not contend either that the Oakland County Claim is not secured by the Hotel, or that any of the Debtor's secured creditors listed on schedule D hold a lien or interest that is superior to the lien that secures the Oakland County Claim. However, the Debtor has raised the question of which of the statutory liens in Michigan that secure the Oakland County Claim – i.e., the lien securing the payment of taxes or the lien securing the payment of water and sewerage charges – takes priority under Michigan law. The answer to this question is relevant because it may make a difference in determining the *extent* of the disallowance required by § 502(b)(3) to the portion of the Oakland County Claim that is for taxes.

Mich. Comp. Laws Ann. § 211.40 provides that a tax assessed against real property in Michigan is secured by a lien on such property. Further, Mich. Comp. Laws Ann. § 123.162 provides that water and sewerage charges are also secured by a lien upon the real property at which such water and sewerage charges were incurred. As between these two state law statutory liens, one for taxes and the other for water and sewerage charges, Michigan law grants first priority to the lien

-23-

for taxes pursuant to Mich. Comp. Laws Ann. § 211.60a(4), which provides that a lien for delinquent real property taxes is "a preferred or first claim on the property." See also Mich. Comp. Laws Ann. § 123.165 ("The lien created by this act [for water and sewerage charges] shall . . . have priority over all other liens *except* taxes or special assessments[.]") (emphasis added).

In this case, for purposes of applying § 502(b)(3) to the portion of the Oakland County Claim that is for taxes assessed against the Hotel, the value of the bankruptcy estate's interest in the Hotel is the full amount of the appraised fee simple value of $690,000.00, since there are no liens upon or interests in the Hotel that are superior to the lien that secures the taxes owed to Oakland County. Therefore, because the portion of the Oakland County Claim that is for taxes assessed against the Hotel ($1,916,781.57), exceeds the value of the bankruptcy estate's interest in the Hotel ($690,000.00) by $1,226,781.57, disallowance of that amount of the Oakland County Claim is required under § 502(b)(3), but no more.

Before leaving the discussion of how § 502(b)(3) applies to the Oakland County Claim, there is one more issue raised by Oakland County that requires attention. Specifically, Oakland County argues that even if § 502(b)(3) does apply to disallow a portion of the Oakland County Claim, whatever portion of the Oakland County Claim is disallowed should be entitled to treatment as an unsecured pre-petition priority claim under § 507(a)(8). This argument, which Oakland County does not support by any citations to authority, is contrary to the plain language of § 507(a)(8), which expressly applies only to "allowed claims of governmental units." It is well established that "[m]any rights under the Bankruptcy Code are keyed to 'allowed' claims. . . . For instance, only holders of allowed claims receive distributions from the bankruptcy estate" and disallowance means a claim holder is not entitled to receive any distribution. Kronemyer v. American Contractors Indemnity

Co. (In re Kronemyer), 405 B.R. 915, 920 (B.A.P. 9th Cir. 2009) (although discussing allowance and disallowance in the context of Chapter 7, the same concepts apply in Chapter 11). All that § 507 does is to establish priorities for certain types of claims that are *allowed*. Because § 502(b)(3) mandates *disallowance* of $1,226,781.57, the Court rejects Oakland County's assertion that § 507(a)(8) entitles Oakland County to a priority unsecured claim for such amount.

To recap, the Court agrees with the Debtor that § 502(b)(3) applies to the portion of the Oakland County Claim that is for taxes assessed against the Hotel, but disagrees with the Debtor that § 502(b)(3) applies to the portion of the Oakland County Claim that is for water and sewerage charges for the Hotel. The Court holds that § 502(b)(3) requires disallowance of $1,226,781.57 of the Oakland County Claim. The Court further holds that § 502(b)(3) does not require disallowance of the remainder of the Oakland County Claim, consisting of $2,560,198.12.

<u>Oakland County's arguments why the Court should not<br>apply § 502(b)(3) to the Oakland County Claim</u>

Despite the plain language of § 502(b)(3) and the ease of its mechanical application to the facts in this case, Oakland County makes four arguments as to why the Court should refuse to apply § 502(b)(3) to any portion of the Oakland County Claim.

First, Oakland County relies on the Tax Injunction Act, 28 U.S.C. § 1341 and § 505(a)(2) of the Bankruptcy Code. The Tax Injunction Act provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. "[T]his legislation was first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." Rosewell v. LaSalle National Bank, 450 U.S. 503, 522 (1981) (citation omitted). Section 505(a)(1) of the Bankruptcy Code

modifies this broad injunction by granting bankruptcy courts jurisdiction to determine the amount and legality of certain taxes, subject to the limitations in § 505(a)(2). However, Oakland County argues that the valuations of the Hotel and the assessed taxes for the years 2009, 2010 and 2011 based upon those valuations, fall within the exceptions to § 505(a)(1) contained in § 505(a)(2). As a result, the Tax Injunction Act precludes the Court from applying § 502(b)(3) to any portion of the Oakland County Claim. Oakland County is mistaken.

In objecting to the Oakland County Claim, the Debtor is not asking this Court to enjoin, suspend or restrain the assessment, levy or collection of any tax owed to Oakland County or, to use Oakland County's words, to set aside or attack the valuations of the Hotel and the associated taxes. The relief sought by the Debtor is much more limited. The Debtor's objection only asks the Court to apply one specific section of the Bankruptcy Code that expressly authorizes the Court to allow or disallow a claim in a bankruptcy case, to a claim that Oakland County chose to file in this bankruptcy case, solely for the purpose of determining how much of that claim should be allowed to receive a distribution in the bankruptcy case. There is nothing in the Tax Injunction Act that prohibits the Debtor in any way from invoking § 502(b) to object to the allowance of the Oakland County Claim. Further, Oakland County's citation to § 505 is irrelevant. The Debtor is not seeking to have this Court determine the Debtor's tax liability to Oakland County, nor to challenge in any way either the assessments of the Hotel made by the City of Southfield or the orders entered in the Michigan Tax Tribunal proceeding that the Debtor brought against the City of Southfield. The Debtor's reliance on § 502(b)(3) is not barred by anything in either the Tax Injunction Act or § 505.

Second, Oakland County argues that the Court should decline to apply § 502(b)(3) based on legislative intent. The starting point to consider whether this Court may look to the legislative

policies behind a statute is, of course, the statutory language itself. See Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text[.]") (citation omitted). Only in those instances where the language is ambiguous or the rare cases where literal interpretation of the statute would produce an absurd result, should the Court consider legislative history to construe the language. Chrysler Corp. v. Commissioner, 436 F.3d 644, 654 (6th Cir. 2006) ("Only when our reading results in ambiguity or leads to an unreasonable result, may we look to the legislative history.") (citation omitted).

Oakland County does not contend that the statute is ambiguous. But Oakland County does argue that application of the statute in this case produces an absurd result. Oakland County concedes that § 502(b)(3) on its face makes no distinction based upon whether a debtor intends to retain the property against which the tax was assessed. However, Oakland County argues that § 502(b)(3) was only intended to be applied when the property against which the tax was assessed is either abandoned or surrendered such that the bankruptcy estate no longer retains any interest in such property. In this case, the Debtor is planning to retain ownership of the Hotel rather than abandon it or otherwise remove it from the bankruptcy estate. According to Oakland County, application of § 502(b)(3) in these circumstances would be absurd because the result will be contrary to the congressional policies behind § 502(b)(3), those being preventing a windfall to mortgagees who would unfairly benefit from the payment of property taxes by the bankruptcy estate, and preventing injustice to unsecured creditors of the bankruptcy estate by allowing a property tax claim to dilute their recovery.

In support, Oakland County cites two decisions by courts outside of the Sixth Circuit that have not applied § 502(b)(3) literally where those courts found, on their particular facts, that the

policies of the statute would not be furthered.  See Universal Seismic Associates, Inc. v. Harris County (In re Universal Seismic Associates, Inc.), 288 F.3d 205 (5th Cir. 2002) (allowing a personal property tax claim against the bankruptcy estate where the debtors surrendered some of their personal property to their secured creditors and lessors, and sold the balance); In re NVF Co., 394 B.R. 33 (Bankr. D. Del. 2008) (allowing a real property tax claim against the bankruptcy estate where the building against which the real property taxes were assessed was abandoned as worthless).

Neither of these cases is binding on this Court.  More importantly, they are both factually inapposite.  In both cases, the courts declined to apply § 502(b)(3) where the subject property was no longer in the bankruptcy estate.  Regardless of whether they were correctly decided, it does not follow from these cases that § 502(b)(3) should not be applied to the converse situation, where the subject property is still in the bankruptcy estate.  Finally, neither of these cases involved a debtor – like the Debtor in this case – who proposed to pay in full the appraised value of the subject property against which the tax was assessed.  These cases do not persuade the Court that application of § 502(b)(3) to cases where a debtor retains the subject property produces an absurd result.

The bankruptcy estate's interest in this case consists of fee simple ownership of the Hotel.  The amount of the Oakland County Claim that consists of a tax assessed against the Hotel greatly exceeds the appraised value of the fee simple ownership of the Hotel.  The Court declines Oakland County's invitation to read an additional qualification into the statute that limits § 502(b)(3)'s application to instances where the subject property is no longer in the bankruptcy estate.

Oakland County's third argument is that, even if § 502(b)(3) is not generally limited to cases where the subject property is abandoned or sold by the bankruptcy estate, the Debtor's retention of the Hotel under the Plan produces an absurd result in this particular case because it will enable the

Debtor to reap a windfall at Oakland County's expense. This argument is somewhat hard to follow since Oakland County does not dispute that the Plan proposes to pay it $690,000.00, and Oakland County did not adduce any evidence to show that the Hotel had a value greater than $690,000.00 on the petition date. But implicit in Oakland County's windfall argument is the unspoken assumption that the Debtor's retention of the Hotel under the Plan somehow creates value greater than $690,000 for the Debtor, and the Debtor's retention of this additional value gives rise to the potential windfall. Although not precisely stated this way by Oakland County, the premise of this argument seems to be that the true value of the Hotel is not merely a reflection of either the appraised value of the Hotel or the bankruptcy estate's equity in the Hotel.

In support of its windfall argument, Oakland County cites In re Precision Concepts, Inc., 305 B.R. 438 (Bankr. M.D.N.C. 2004). The debtor in that case was a manufacturing business. Id. at 440. The debtor owned machinery, equipment and other personal property that it used in its business, all of which was fully encumbered by various security interests, but owned no real property. For years, the debtor failed to list its business personal property with Forsyth County, in violation of North Carolina law. When this finally came to its attention, Forsyth County made a tax assessment against the debtor for the previous five years in the approximate amount of $300,000.00. Under North Carolina law, property taxes assessed on personal property constitute a lien on real property within the county as of the assessment date. Id. at 443. Unfortunately for Forsyth County, because the debtor did not own any real property in Forsyth County, Forsyth County's tax assessment was largely an unsecured claim. Id.

After the debtor filed a Chapter 11 petition, Forsyth County filed a proof of claim for the delinquent personal property taxes, plus an additional amount that had subsequently came due. Soon

-29-

after filing Chapter 11, the debtor filed a motion under § 363 of the Bankruptcy Code to approve an agreement to sell substantially all of its assets, including the personal property used in its business. The court granted the motion. Id. at 441. Between the time the motion was filed and the time it was approved, the debtor continued its operations and generated cash profits that were not included in the § 363 sale, but instead were to be retained by the bankruptcy estate. After closing the sale, the debtor filed an objection to Forsyth County's claim under § 502(b)(3). Id. at 441-42.

The Precision Concepts court reviewed the legislative history of § 502(b)(3) and the few reported bankruptcy court decisions that have applied it, and then turned to the debtor's contention that § 502(b)(3)'s phrase, "the value of the interest of the estate in such property," refers only to the equity in the debtor's property. Id. at 443. According to the debtor, all of the sales proceeds of the personal property were paid directly to its secured creditors because "the personal property [was] over encumbered[.]" Accordingly, "there [was] no equity and, therefore, no value and no claim for any taxes." Id. In other words, because the debtor had no equity in its personal property, the bankruptcy estate's value in the personal property against which the tax was assessed was zero. As a result, the debtor argued that all of Forsyth County's claim should be disallowed by § 502(b)(3). The court disagreed.

While the other cases cited by Oakland County, Universal Seismic and NVF, relied heavily upon the congressional policies behind § 502(b)(3) as supporting their decisions not to apply the statute's plain language, the Precision Concepts case turned on the meaning given by the court to the words in the statute. Specifically, for purposes of ascertaining the "value of the interest of the estate" in the property against which the tax is assessed under § 502(b)(3), the court in Precision Concepts held that "[t]he amount of equity in the property is not the determining factor. The

-30-

determining factor is whether the tax claim exceeds the value of the interest of the estate in such property." Id. at 445 (internal quotation mark omitted). The court explained that the debtor had used the personal property to continue its business operations during the Chapter 11 case until the sale was closed, and had generated profits from those operations. Further, the business personal property was an important part of the § 363 sale. The court found that those facts demonstrated that the business personal property, even though over encumbered, did provide value to the bankruptcy estate as it

> was essential to the continued operation of the company, resulting in realization of income and a successful § 363 sale. The use of this equipment resulted in positive cash flow to the company in an amount of approximately $1,000,000. The fact that the property was over encumbered does not mean that the property was of no value.

Id. at 445 (citation omitted). Because the amount of the profits generated by the debtor's post-petition operations, combined with the amount of the § 363 sale proceeds that became available to distribute to unsecured creditors, together exceeded the amount of Forsyth County's claim, the Precision Concepts court held § 502(b)(3) to be inapplicable and denied the debtor's objection. Id.

Oakland County's windfall argument in this case is similar to Forsyth County's argument in Precision Concepts, albeit based on different facts. In both cases, the taxing authority is essentially arguing that the property against which the tax was assessed has a value greater than the bankruptcy estate's equity in such property. In Precision Concepts, this argument was based on the fact that the debtor used the personal property to operate its business and generate profits, and then included that personal property in a sale that provided payments to various creditors. In the case before the Court, Oakland County does not point to any tangible benefits that the Debtor enjoys from the Hotel, such as operating profits or a sale that produced proceeds to pay the Debtor's creditors. Instead, Oakland County supports its argument only by the conclusory statement that the Debtor's

-31-

retention of the Hotel gives the Debtor a windfall. Oakland County neither explains how retention of the Hotel creates a windfall, nor quantifies in any way this alleged windfall. Most importantly, Oakland County, unlike the taxing authority in Precision Concepts, does not attempt to show how or why the Hotel has a value to the bankruptcy estate that is greater than the appraised value ascribed to the Hotel by Allen of $690,000.00.

The Court need not express any view one way or the other regarding the holding in Precision Concepts that the value of a bankruptcy estate's interest in property for purposes of § 502(b)(3) is not limited to its equity in such property. In this case, in contrast to Precision Concepts, Oakland County has not adduced any evidence to demonstrate that the value of the bankruptcy estate's interest in the Hotel is greater than $690,000.00. The Debtor proposes to pay the full appraised value of fee simple ownership of the Hotel – $690,000.00 – to Oakland County on the effective date of the Plan. Although the Debtor plans to renovate the Hotel, and thereby increase the value of the Hotel *in the future*, the evidence in the record shows that any potential future increase in value through the proposed renovation and operation will come from the investments to be provided in the future by KFG, Elhadad and others. That is not value now existing in the bankruptcy estate's interest in the Hotel.

The Court rejects Oakland County's contention that the application of § 502(b)(3) in these circumstances will give a windfall to the Debtor, or otherwise produce an absurd result in this case. Absent an ambiguity in the statute or an absurd result that is produced by application of the statute – neither of which is present here – the Court's task is to apply the plain text without considering legislative policies. In this case, as explained above, application of the plain text of the statute requires disallowance of $1,226,781.57.

Oakland County's fourth and final argument is based upon a section of the Bankruptcy Code that only applies in Chapter 11 cases. Simply put, Oakland County argues that even if § 502(b)(3) would otherwise apply to disallow the portion of the Oakland County Claim that is for taxes, that application is mitigated in a Chapter 11 case, like this case, by § 1111(b)(1)(A). In relevant part, that section provides that:

> A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse . . . .

This section of the Bankruptcy Code was enacted to address what Congress believed to be an unfair treatment in reorganizations for certain secured creditors whose claims exceed the value of their collateral. Specifically, Congress articulated a need to address "the nonrecourse loan problem and give[] the creditor an unsecured claim for the difference between the value of the collateral and the debt in response to the decision in Great National Life Ins. Co. v. Pine Gate Associates . . . ." S. Rep. No. 95-989, at 65 (1978) (referring to § 502(i)); *see also* H.R. Rep. No. 95-595, at 6519, 6544 (1977) (deleting the Senate Bill's § 502(i), but adopting its policy into § 1111).

In order to fully understand the purpose and effect of § 1111 in Chapter 11 cases, and to consider Oakland County's argument as to how it applies in this case, it is necessary to first examine what Congress referred to as "the nonrecourse loan problem," that emerged from the facts of the Pine Gate case. Great National Life Ins. Co. v. Pine Gate Assoc., Ltd. (In re Pine Gate Assoc., Ltd.), No. B75-4345A, 1976 WL 359641 (N.D. Ga. Oct. 20, 1076). In Pine Gate, a secured creditor, Great National, appealed from a bankruptcy court's denial of its motion to lift the stay to permit it to foreclose on the property that secured its claim. Id. at *1, *3. Great National held a first mortgage on the debtor's sole asset, an apartment complex, which secured a nonrecourse promissory note.

-33-

Id. at *3.  Because an economic recession had depressed real estate values, Great National was now undersecured.  The debtor sought to cramdown a Chapter XII plan of arrangement under the Bankruptcy Act of 1898, the predecessor to the Bankruptcy Code.  Id. at *4.  The plan proposed that Great National would receive only the cash value of its collateral and that the entire debt of Great National would be extinguished.  Great National objected, but the bankruptcy court overruled its objection.

> On appeal, the district court upheld the bankruptcy court's decision, summarizing as follows:

> Section 461(11)(c) [of the Bankruptcy Act] may be constitutionally applied to extinguish the debt of the dissenting secured creditors, and a Plan of Arrangement confirmed in spite of such dissenting class, so long as the dissenting class of creditors is compensated by the payment in cash of the value of the debt; i.e., the value of the secured property.

Id. at *17.  The effect of this decision on Great National was significant.  Great National's entire claim was reduced to the value of its collateral.  Great National was left without the right either to foreclose on its collateral or the right to pursue any other recourse to collect its deficiency, even if the value of its collateral subsequently increased.  Id.  This result was widely perceived as creating a windfall for opportunistic debtors:  a debtor could "cash out" an undersecured creditor for the value of its collateral, at a time when property values were down, resell the property once values rebounded, and pocket the profit.  Id. at *6, n.12; see also First Federal Bank of California v. Weinstein (In re Weinstein), 227 B.R. 284, 295 n.12 (B.A.P. 9th Cir. 1998).

Section 1111(b)(1)(A) mitigates the Pine Gate problem in two ways.  First, regardless of whether an undersecured lender holds a recourse or nonrecourse obligation under state law, all claims secured by a lien on property of the estate are treated under this statute "*as if the holder of such claim had recourse against the debtor on account of such claim.*"  At a minimum, this means

-34-

that an undersecured creditor will at least have the right to enforce an unsecured deficiency claim, even if it would not have this right under applicable non-bankruptcy law in the absence of a bankruptcy case. Second, § 1111(b)(1)(A)(i) then provides the undersecured creditor with the right to decline this unsecured deficiency claim, and instead elect to have its entire claim (including the undersecured deficiency portion) treated under § 1111(b)(2) as an allowed secured claim, notwithstanding § 506(a) of the Bankruptcy Code. The § 1111(b) election effectively protects an undersecured creditor from being "cashed out" in a cramdown plan at an unfavorable valuation without the opportunity to benefit either from an appreciation in the value of its collateral or by having a deficiency claim to share in any other distribution from the bankruptcy estate.

Oakland County argues that § 1111(b)(1)(A) is designed to address precisely the situation before the Court. According to Oakland County, even though its claim for taxes against the Hotel would not entitle it to a recourse claim against the Debtor outside of this bankruptcy case, § 1111(b)(1)(A) operates to provide it with a full recourse claim in this Chapter 11 case. Therefore, if the Debtor is successful in invoking § 502(b)(3) to disallow the portion of the Oakland County Claim consisting of taxes assessed against the Hotel, to the extent that such portion exceeds the value of the bankruptcy estate's interest in the Hotel, then Oakland County must be entitled under § 1111(b)(1)(A) to a deficiency claim for whatever amount is disallowed. Here, that means that the $1,226,781.57 that the Court disallowed under § 502(b)(3) earlier in this opinion would be treated as an unsecured claim in favor of Oakland County. Whether that unsecured claim is entitled to priority treatment under § 507(a)(8), or is simply treated as a general unsecured claim under class three, is yet another issue to consider, but Oakland County's larger point here is that § 1111(b)(1) trumps § 502(b)(3) by permitting Oakland County to have a deficiency claim for

-35-

whatever amount is disallowed under § 502(b)(3). This will enable Oakland County, at a minimum, to vote that deficiency claim to reject the Plan.

The Debtor argues that § 1111(b)(1)(A) does not trump § 502(b)(3). The Debtor points out that § 1111(b)(1)(A) does not state that it is to be applied *notwithstanding* § 502(b)(3). Instead, it begins by expressly recognizing the allowance or disallowance of a claim that occurs *under* § 502. The Debtor argues that § 1111(b)(1)(A) does not prevent the Court from disallowing a claim under § 502; rather it contemplates that once a claim is allowed under § 502, then such claim shall be treated under § 1111(b)(1)(A) as a full recourse claim, regardless of whether it was a full recourse claim absent the Chapter 11 case. Stated another way, the Debtor argues that the Court should first apply the allowance or disallowance provisions of § 502, including specifically § 502(b)(3), before turning to consideration of § 1111(b)(1)(A). Without conceding that there is any conflict between § 502(b)(3) and § 1111(b)(1)(A), the Debtor asserts that § 502(b)(3) controls the outcome in this case. The Debtor reasons that § 502(b)(3) is the more specific statute, since it applies to disallowance of *tax* claims, whereas § 1111(b)(1)(A) applies more generally to all types of claims, whether or not for taxes, that are secured by a lien on property of the estate. Since § 502(b)(3) mandates disallowance of the portion of the Oakland County Claim that is for taxes assessed against the Hotel in excess of the value of the Hotel, the Debtor asserts that this portion of the Oakland County Claim, having now been disallowed, is no longer susceptible to treatment under § 1111(b)(1)(A).

The Court agrees with Oakland County's conception of § 1111(b)(1)(A) and its intended purposes. There is no doubt that Congress enacted § 1111(b)(1)(A) to deal with the <u>Pine Gate</u> problem that Oakland County identifies. The problem for Oakland County, however, is that

§ 502(b)(3) is, as the Debtor emphasizes, a *disallowance* provision, just like all of the other provisions under § 502(b). As noted earlier, once a claim is disallowed, the holder of that claim cannot receive a distribution from the bankruptcy estate on account of the disallowed claim. The Court agrees with the Debtor that once any amount of the Oakland County Claim is disallowed pursuant to § 502(b)(3), § 1111(b)(1)(A) does not somehow breathe life back into that amount, whether as a recourse or a non-recourse claim, and whether secured or unsecured. Section 502(b)(3) *disallows* it, for all purposes. Were it not for the disallowance function of § 502(b)(3), it appears that § 1111(b)(1)(A) would permit Oakland County to have a deficiency claim for the amount of the taxes assessed against the Hotel that exceed the value of the Hotel. But § 502(b)(3) is the more specific statute, applicable only to claims for taxes assessed against property of the estate. Here, § 502(b)(3) requires disallowance of the Oakland County Claim for taxes assessed against the Hotel in excess of the value of the Hotel. It therefore blocks Oakland County from ever getting the disallowed portion of the Oakland County Claim to § 1111(b)(1)(A).

The Debtor and Oakland County have not cited to any cases that discuss the interplay between § 502(b)(3) and § 1111(b)(1)(A), nor has the Court found any. But the Court is convinced that the two sections do not conflict. To the extent that the Court disallows any amount of the Oakland County Claim, whether under § 502(b)(3) or, for that matter, under any of the other grounds for disallowance enumerated in § 502(b), the disallowed amount is extinguished, and § 1111(b)(1)(A) does not apply.

Although the Court holds that § 1111(b)(1)(A) does not help Oakland County with respect to the amount of the Oakland County Claim that is disallowed under § 502(b)(3), that does not mean that it does not apply to the rest of the Oakland County Claim. As explained, the portion of the

-37-

Oakland County Claim that is for water and sewerage charges, consisting of $1,870,198.12, is not disallowed by § 502(b)(3).  The Debtor raises no other grounds to disallow this amount.  Neither the Debtor nor Oakland County specifically address the question of whether the water and sewerage charges constitute a recourse or a non-recourse claim against the Debtor, but they do agree that it is a claim that is secured by property of the estate.  That is enough for the Court to apply § 1111(b)(1)(A) to the water and sewerage charges in the Oakland County Claim.

In this case, because of the senior lien on the Hotel that secures the taxes assessed against the Hotel, there is no equity to support any of the water and sewerage charges owing to Oakland County.  That means that the entire $1,870,198.12 of water and sewerage charges included in the Oakland County Claim is, effectively, unsecured.  The consequence of applying § 1111(b)(1)(A) to the portion of the Oakland County Claim made up of water and sewerage charges is that Oakland County becomes the holder of a recourse claim against the Debtor in that amount.  Because Oakland County has not made an election under § 1111(b)(1)(A)(i) to have such claim treated as a secured claim under § 1111(b)(2), the Court must treat such claim as an unsecured claim consistent with § 506(a).  Finally, as there is no evidence before the Court, nor any citations to authority, that would support granting such unsecured claim priority treatment under § 507 of the Bankruptcy Code, the Court will treat that unsecured deficiency claim as a class three non-priority unsecured claim for purposes of the Plan.

In sum, the Oakland County Claim of $3,786,979.69 is broken down into $1,916,781.57 for taxes and $1,870,198.12 for water and sewerage charges.  Of the portion for taxes, the Court disallows $1,226,781.57 under § 502(b)(3) and allows the balance of $690,000.00.  That amount is allowed as a secured claim pursuant to § 506(a) of the Bankruptcy Code.  None of the

-38-

$1,870,198.12 for water and sewerage charges is disallowed under § 502(b)(3). The Court allows this amount under § 502(b) and § 1111(b)(1)(A) as a non-priority unsecured claim, to be treated under class three of the Plan.

## OAKLAND COUNTY'S OBJECTIONS TO CONFIRMATION

Oakland County makes many objections to confirmation of the Plan,[1] one of which is that the Plan is not feasible. In the Court's view, the feasibility objection overrides all others and should be dealt with first.

In order to confirm a Chapter 11 plan, it must be feasible. Under § 1129(a)(11), a court must find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." "Although the [Bankruptcy] Code does not use the terms 'feasible' or 'feasibility,' the requirement imposed by § 1129(a)(11) is commonly known as the 'feasibility' test for confirmation." In re Trenton Ridge Investors, LLC, 461 B.R. 440, 478 (Bankr. S.D. Ohio 2011) (internal quotation marks and citations omitted). The purpose of the feasibility requirement of § 1129(a)(11) "is to protect creditors against unrealistic plans that have little or no chance of success." In re Adelphia Business Solutions, Inc., 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003). "'The debtor bears the burden of proving by a preponderance of the evidence that the plan is not likely to fail.'" In re Griswold Bldg., LLC, 420 B.R. 666, 697 (Bankr. E.D. Mich. 2009) (quoting In re Eastland Partners Limited Partnership, 149 B.R. 105, 108 (Bankr. E.D. Mich. 1992)).

---

[1] The United States Trustee ("UST") also filed objections to the Plan, but these objections were resolved by a stipulation placed on the record by the UST and the Debtor at the beginning of the evidentiary hearing.

"Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment." In re Brice Road Devs., L.L.C., 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008) (internal quotation marks and citation omitted). "Feasibility determinations must be firmly rooted in predictions based on objective fact." In re Griswold Bldg., 420 B.R. at 697 (citation omitted). Whether a Chapter 11 plan is feasible involves a factually intensive inquiry. Several factors "are relevant to determining whether the reorganized company is likely to liquidate" including:

> "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan."

Griswold Bldg., 420 B.R. at 697 (quoting Teamsters National Freight Industry Negotiating Committee v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581, 589 (6th Cir. 1986)). These factors are not exhaustive, and, courts have examined additional factors including "the past financial performance of the debtor, the availability of credit if the plan is dependent on additional financing, and the term of the plan." Id. (citations omitted).

As noted earlier, at the evidentiary hearing, the Debtor changed both the financing for the Plan and the payments to be made under the Plan. As for financing, the record shows that the Debtor does not have any capital of its own. Nor does it have any income from any business operations. The record shows that the Debtor's ability to pay Oakland County's allowed secured claim of $690,000.00 is entirely dependent upon obtaining the necessary funds from an outside source. But the evidence is clear and uncontroverted that the Debtor does not have a commitment from KFG, or from any other source, either to provide the $690,000.00 necessary to pay the portion

-40-

of the Oakland County Claim that is allowed as a secured claim or to renovate and rehabilitate the Hotel. The Letter of Intent expressly states that its purpose is to "confirm the interest of an investor group," and expressly states that it is not a "binding obligation." In his testimony, Knafo took pains to explain that neither he nor KFG are obligated either to loan or invest any money with the Debtor or in the Hotel.

The Court does not question the sincerity of Knafo, nor even the potential that KFG and Knafo present. At an earlier stage of a Chapter 11 case, perhaps in the context of a hearing on a motion for relief from stay pre-confirmation, an expression of interest from an investor or a non-binding letter of intent, may be sufficient. But not now. This is the date and time for confirmation of the Plan. The Court's task *today* is to determine whether there is a reasonable probability that the Debtor will make the payments proposed by the Plan, as modified by the Debtor at the evidentiary hearing.

Without a binding letter of intent or loan agreement, or other presently available funds, the Court first concludes that the Debtor has failed to show that there is a reasonable probability that the Debtor will make the lump sum payment of $690,000.00 to Oakland County on its allowed secured claim.

Second, and even more problematic for the Debtor, are the payments that the Plan requires the Debtor to make to the unsecured claims in class three. Based upon the oral modification to the Plan made by the Debtor at the evidentiary hearing, the Debtor's proposed payments to holders of claims in class three will increase each month, from $623.56 to $9,353.35. Over the next ten years, that means that the total of the Debtor's payments to class three claims will increase from $74,827.20 to $1,122,402.00. The Debtor does not have the funds to make these payments. The

-41-

Hotel remains closed and has generated virtually no income for years. The entire source of funding for the payments to be made to the holders of class three claims is based upon implementation of the Letter of Intent and the Loan Agreement, followed by KFG attracting additional unidentified lenders to invest in the renovation and rehabilitation of the Hotel. But the Debtor has not offered, or even assembled, any projections that show that the Debtor will be able to make these payments. Even Knafo concedes that he has not assembled any projections, and he testified that he does not agree with the only projections that he has ever examined prepared by any party to show the Hotel's revenues in the event that it is to reopen. There is no probative evidence in the record to show that there is a reasonable probability that the Debtor will make the payments to the class three claims that the Debtor now proposes.

The Debtor's inability to make the proposed payments to class three creditors is made even worse when the deficiency claim that Oakland County holds in the amount of $1,870,198.12 is added to the class three claims. Adding it to the $3,741,341.00 of other unsecured claims described by the Plan as being within class three, brings the total of class three claims to $5,611,539.12. A 30% distribution to class three claims, as currently proposed by the Debtor, with the inclusion of Oakland County's unsecured claim, means that the Debtor will have to pay a total of $1,683,461.74 to class three claims over the next ten years, or $14,028.85 per month, beginning in the first month after the effective date of the Plan. The record is devoid of any evidence to show that the Debtor has a reasonable probability of making these payments, even if the Court assumes that the Letter of Intent and Loan Agreement are implemented.

The Court has carefully weighed all of the evidence. It does not establish that the Plan is feasible. Instead, the evidence shows that confirmation of the Plan is likely to be followed by

-42-

liquidation or the need for further financial reorganization. Therefore, confirmation of the Plan must be denied because the Debtor has failed to meet its burden to show that the Plan complies with § 1129(a)(11).

As noted above, Oakland County has other objections to confirmation of the Plan under § 1129(a) and (b). But even if the Court were to overrule such other objections, the Plan is, for all of the reasons set forth above, simply not a feasible plan of reorganization. And the Court's adverse rulings on the Debtor's § 502(b)(3) arguments only make it that much worse for the Debtor. In these circumstances, where the Court concludes that the Plan is not feasible, and that confirmation must be denied under § 1129(a)(11), the Court need not reach Oakland County's other objections to confirmation nor the Debtor's responses to them. It is enough that the Plan is not feasible for the Court to conclude that confirmation must be denied.

### OAKLAND COUNTY'S MOTION FOR STAY RELIEF

Section 362(d)(1) of the Bankruptcy Code provides that on request of a party in interest and after notice and a hearing, the Court shall grant relief from the automatic stay, such as by terminating, annulling, modifying, or conditioning such stay "(1) for cause, including the lack of adequate protection of an interest in property of such party in interest." The Bankruptcy Code does not define "cause" as used in § 362(d)(1). Therefore, under § 362(d)(1), "courts must determine whether discretionary relief is appropriate on a case by case basis." Laguna Associates L.P. v. Aetna Casualty & Surety Co. (In re Laguna Associates L.P.), 30 F.3d 734, 737 (6th Cir. 1994). "As used in § 362(d)(1), the term 'cause' is a broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations." In re Indian River Estates, Inc., 293 B.R. 429, 433 (Bankr. N.D. Ohio 2003) (citation omitted). . . .

Chrysler LLC v. Plastech Engineered Products, Inc. (In re Plastech Engineered Products, Inc.), 382 B.R. 90, 106 (Bankr. E.D. Mich. 2008).

To be sure, cause is an elastic concept. "[I]f the relief from stay is requested at the early stages of the bankruptcy case, the burden upon the debtor is less stringent. But, if relief from stay is requested later in the case, the debtor's showing

-43-

is closely scrutinized." Sumitomo Trust & Banking Co. v. Grand Rapids Hotel L.P. (In re Holly's Inc.), 140 B.R. 643, 700 (Bankr. W.D. Mich. 1992) (citing United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 376 (1988)). The longer the case goes on, the more the analysis may change and the balance of competing interests may compel a different result.

Id. at 109 (declining to lift the stay at that time as the case was in the very early stages).

The Debtor filed this Chapter 11 case nearly one year ago. Since filing its petition, the Debtor has not operated the Hotel. The Debtor has not paid property taxes on the Hotel. The Hotel's condition has continued to deteriorate since the petition was filed. The Debtor has not provided Oakland County with any protection for its interest in the Hotel during this Chapter 11 case. Further, the Court has now denied confirmation of the Plan. These facts, in combination, provide sufficient cause for the Court to lift the automatic stay under § 362(d)(1) of the Bankruptcy Code.

Section 362(d)(2) provides alternative grounds for relief from the stay.

That section of the Bankruptcy Code provides that: "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning [the] stay . . . with respect to a stay of an act against property . . ., if (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." Relief requires a showing of both elements. . . .

"'Equity,' is the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of the unsecured creditors." Stephens Industries, Inc. v. McClung, 789 F.2d 386, 392 (6th Cir. 1986) . . . .

Id.

Establishing that property is "necessary to an effective reorganization" requires [ ] not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means . . . that there must be a reasonable possibility of a successful reorganization within a reasonable time."

Id. (quoting United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc, 484 U.S. at 375-76).

-44-

The Debtor does not have any equity in the Hotel and, because the Court has now denied confirmation of the Plan, there is no reorganization in prospect in this Chapter 11 case. These facts provide grounds to grant relief from the automatic stay under § 362(d)(2) of the Bankruptcy Code.

Although there are other grounds upon which Oakland County relies in its request for relief from the automatic stay, the Court need not address those grounds, because it concludes for the reasons set forth above, that there are sufficient grounds to grant relief from the automatic stay under § 362(d)(1) and (2).

## CONCLUSION

The Debtor is correct that the Bankruptcy Code permits single asset real estate cases to be filed under Chapter 11. The Debtor is also correct that Chapter 11 does not require the Debtor to operate a business with the single asset while it is in Chapter 11. But this Chapter 11 case is predicated entirely on the Debtor invoking § 502(b)(3) to disallow the Oakland County Claim to the extent that it exceeds the value of the bankruptcy estate's interest in the Hotel. For the reasons explained in this opinion, the Court concludes that § 502(b)(3) does not entitle the Debtor to all of the relief that it requests. Section 502(b)(3) requires disallowance only of $1,226,781.57 of the total amount of the Oakland County Claim of $3,786,979.69. The remainder of the Oakland County Claim that is not disallowed by § 502(b)(3), is allowed in the amount of $2,560,198.12. Of that amount, $690,000.00 is allowed as a secured claim, and $1,870,198.12 is allowed as an unsecured claim.

The Plan does not propose to pay the allowed amount of the Oakland County Claim in full. Therefore, the Oakland County Claim is impaired, and Oakland County may both vote on and object to the Plan. Oakland County and the Debtor both raise numerous legal issues based upon Oakland

County's vote and its objections. But ultimately the evidence in the record determines the outcome in this case and renders it unnecessary to discuss each and every legal issue raised by the parties. The evidence does not demonstrate that there is a reasonable probability that the Debtor will make the payments that it now proposes, either with respect to the allowed secured portion of the Oakland County Claim, or the allowed unsecured portion. As a result, the Plan is not feasible and cannot be confirmed under § 1129(a)(11).

The Court will enter its own order regarding each of the three contested matters. consistent with this opinion.

.

Signed on January 20, 2015

                                    /s/ Phillip J. Shefferly
                                   Phillip J. Shefferly
                                   United States Bankruptcy Judge